PEOPLE of the State of South Dakota in the Interest of M.K., a Minor Child, and Concerning J.K. and S.L., Jr., Respondents.

No. 16943.

Supreme Court of South Dakota.

Argued Oct. 24, 1990.

Feb. 20, 1991.

Mark L. Bratt, Asst. Atty. Gen., Roger A. Tellinghuisen, Atty. Gen., on the brief, Pierre, for appellee, State.

Robert L. Morris, Belle Fourche, for appellant, J.K.

William A. Delaney, Deadwood, for appellee, M.K.

WUEST, Justice.

J.K., mother of M.K., appeals the judgment of the circuit court terminating her parental rights to M.K.[1] We affirm.

J.K. (Mother) is a developmentally delayed adult, twenty-one years of age, with an I.Q. of 68. She is borderline mentally retarded and is socially retarded. In early 1987, Mother conceived M.K., the child at issue in this appeal. In August 1987, the Department of Social Services (Social Services) received a referral that Mother needed assistance in deciding whether to parent her expected child or place the child for adoption. Mother elected to parent the baby and on November 19, 1987, M.K. was born.

Less than a year later, on October 31, 1988, a Dependency and Neglect Petition was filed which alleged M.K. lacked proper supervision through the acts or omissions of Mother and endured an environment injurious to his welfare. M.K. was adjudicated a dependent and neglected child at an Adjudicatory Hearing. A Dispositional Hearing was held in January 1989. Subsequent review dispositional hearings were held in April, June and September 1989. Pursuant to the last review hearing, Mother's parental rights to M.K. were terminated.[2]

Mother raises three issues on appeal:

I. Whether the court's findings of fact and conclusions of law entered after the adjudicatory hearing were clearly erroneous;

II. Whether the termination of Mother's parental rights was the least restrictive alternative; and,

III. Whether the court erred by not ordering a mental health examination of M.K. pursuant to SDCL 26–8–22.8.

We address Mother's contentions seriatim.

### I.

#### A.

It is important to detail the facts as shown by the evidence presented at the Adjudicatory and Dispositional Hearings. After M.K.'s birth, Mother signed up for the women, infants, children (WIC) program.[3] Val Shoemaker, the county health nurse, weighed and measured M.K. and instructed Mother on how to feed the baby. Mother was able to repeat what she was told; however, when questioned, Mother was unable to relate the feeding instructions she had been given. Mother indicated

---

1. Mr. Robert L. Morris, Esq. was appointed to represent J.K. in this appeal and did not represent J.K. at trial.

2. M.K.'s father took no part in any of these proceedings and made no appearance either in person or by an attorney. M.K.'s father's parental rights were also terminated by the court.

3. The WIC program provides baby formula, milk, cereal, and other food stuffs for breast feeding women and children up to five years of age.

she was unable to mix the baby's formula by herself and employed the assistance of her mother in preparing the formula. The community health nurse was concerned about Mother's handling of the child and was uncertain how well Mother would manage with M.K. because she had difficulty understanding the child's needs. Consequently, the community health nurse referred Mother to Social Services.

Mother had difficulty feeding M.K. a sufficient amount of baby formula. Generally, an infant requires two ounces of formula for every pound of body weight. By four months of age, M.K. should have been receiving 32 ounces of formula a day, but was being fed only 16 ounces a day. Mother fed M.K. juice and water instead of baby formula, believing he did not like his formula. Mother was never able to relate with certainty how many ounces of baby formula she fed M.K. In June 1988, Mother began feeding M.K. cow's milk. The National Academy of Pediatrics recommends that children stay on formula until one year of age. The WIC program does not provide cow's milk for infants under one-year old.

Mother also fed M.K. foods inappropriate for his age. At four months, M.K. was being fed fruits, vegetables and juice. Generally, an infant should not be fed fruits or vegetables until six months of age.

The community health nurse requested Mother bring the child in to be measured and weighed on a regular basis so as to chart his development. Mother had a difficult time keeping her appointments and brought M.K. to the health service on an irregular basis. Between April and June 1988, M.K.'s height-to-weight correlation dropped from the seventy-fifth percentile to the twenty-fifth percentile. His weight was not keeping up with his height. In October 1988, M.K.'s height/weight ratio was adequate; however, his head was not growing with the growth curve. From the first month through the third month, M.K.'s head was growing at the twenty-fifth percentile on the growth curve. By March 1988, however, his head growth was

below the fifth percentile and in October 1988, he was still further below the fifth percentile. Such a deviation in head growth from the growth curve is evidence that the child's brain is not developing normally. Whether M.K.'s slow brain growth was due to nutritional deficiencies, his environment, or heredity could not be determined. M.K. was not responding to people and could not hold his head up. The community health nurse observed that the child was not meeting his developmental milestones.

In October 1988, the community health nurse administered the Denver Developmental Test to M.K. He was eleven months old at this time. The test revealed that M.K. had adequate gross motor skills; however, he failed all the fine motor skill tests and was at the five-month level. M.K. was at the nine-to-ten-month level for language and was not indicating any speech. He was at the six-to-seven-month level for personal social skills.

During their visits to the community health nurse, the nurse observed there was not significant interaction between Mother and M.K. Mother was easily distracted and was more interested in what was happening at the secretary's desk than what was happening in the examination room. The community health nurse concluded that M.K. was not receiving adequate stimulation. He was not able to play peek-a-boo and other baby games. He did not respond as a normal child does when handled and lacked muscle tone. The community health nurse concluded that M.K. needed physical and occupational therapy, but thought Mother would have difficulty following instructions.

Peg Albright, a social services aide, was assigned to Mother's case when M.K. was approximately one month old. Mother lived with her parents and sister and brother until July 1988. The social services aide found it difficult to visit with Mother at home because the television was always on and was usually not turned down when requested. On these visits, the social services aide spent most of her time stimulating M.K. while Mother watched television.

**180**

The social services aide was concerned about M.K. being fed a sufficient amount of formula. The social services aide set up a feeding schedule and instructed Mother to record the amount of formula fed M.K. at each feeding. Mother's schedule was very sporadic: some days M.K. received four ounces of formula and other days forty-eight ounces of formula. The social services aide was not sure whether the child was not being fed sufficient formula or whether Mother simply forgot to record the amount of formula fed. Mother claimed she recorded every feeding on the schedule. Mother's schedule often indicated that M.K. was fed in the morning when he awoke, but was not fed for another six hours and then, maybe, fed another ounce or two of formula at bedtime. The social services aide repeatedly discussed with Mother the importance of feeding M.K. his formula. Mother indicated she understood, however, no change in the child's feeding schedule was observed.

In late May 1988, Mother informed the social services aide that M.K. was spitting up his formula and that she had consulted a doctor who recommended he be fed cow's milk. The social services aide requested a doctor's statement, which was never received. It appears Mother requested her doctor send such a statement, but her doctor neglected to send it. The social services aide never observed M.K. becoming ill because of his baby formula.

The social services aide was also concerned about M.K. receiving proper stimulation. Mother did not spend much time stimulating the child: Mother would play with him for two or three minutes, but would quickly lose interest and turn her attentions elsewhere. M.K.'s aunt stimulated the child more than Mother. M.K.'s grandfather would kick at him occasionally and M.K.'s grandmother would talk to him sometimes. The child's bed was in the living room and had no mobile or other decoration around it to attract his attention, and he did not have many toys. The stimulation provided by Mother and the other household members was not sufficient.

Lee Griffin, a social worker, was assigned to Mother's case in June 1988. The social worker counseled Mother on parenting skills and instructed Mother on how to stimulate M.K. During her visits between June and December 1988, the social worker found the television turned off only once. The social worker observed Mother's family teased M.K. One day, Mother's brother dangled keys in front of M.K. and when the baby grabbed for them, brother would pull them away. This continued until M.K. tired of the game. Grandfather then called him "dummy" and "stupid."

In July 1988, Mother rented her own apartment. She brought with her a television, which she watched often. Mother's boyfriend lived with Mother and M.K. for about three weeks in her new apartment. Mother's boyfriend over-disciplined M.K. on occasion: Mother's boyfriend slapped M.K.'s hands until they turned red and spanked the baby's bottom so forcefully it split his diaper. Mother's boyfriend also made a number of long distance phone calls on Mother's telephone, which Mother ultimately paid. The social worker and the social services aide told Mother her boyfriend had to leave, which he did.

In July 1988, M.K. was evaluated at the Midwest Children's Center (Children's Center). He was eight months old at this time and his evaluation showed a twenty-five percent delay in development in those areas tested. The Children's Center instructed the social worker and Mother to work with M.K. in transferring blocks from one hand to the other. The Children's Center also recommended that Mother use a terry cloth washcloth to stimulate M.K.'s face because he was delayed in his sucking motion.

The Children's Center also suggested M.K. be presented with certain types of toys. M.K. had a number of stuffed animals, but no blocks or balls. Mother was instructed to acquire some wooden blocks, legos, playdough, or pop-up books. By December 1988, however, Mother had not purchased these toys. Mother did not buy any presents for M.K. on his birthday. The child had some squeaky toys he carried

around with him, but, by age 1, he had not learned how to squeeze them.

In December 1988, Mother received $154.00 in ADC benefits and $354.00 from Social Security Income. Mother was also receiving WIC benefits and was eligible for food stamps. Mother's rent at her low-income apartment was $58.00. Mother's expenses included cable television, a telephone and electric service. Notwithstanding adequate resources, Mother was often broke within a week of receiving her checks. This concerned the social worker because, at times, M.K. needed medicine which was not covered by government subsidy. Because she was out of money, Mother had to charge M.K.'s medicine until she received her next check.

In September 1988, Mother began attending the partial care program at West River Mental Health and was instructed on living and social skills three days a week. Mother's instruction included such basic life skills as shopping, cooking, and budgeting. Mother was also reminded to brush her teeth. Mother attended partial care regularly in September and October 1988. However, in November her attendance became more sporadic, and by December her attendance ceased.

While Mother attended partial care, M.K. attended day care. On five occasions during the month of September 1988, day care called the social worker because M.K. had arrived with either no food or just one bottle. On one of these occasions, the social worker bought M.K. food, milk and a bottle because he was without food and Mother could not be reached. Mother repaid the social worker. Mother explained that when she ran out of food, she was able to get assistance from her mother.

Initially, Grandmother was Mother's protective payee. The social worker requested Mother provide a list of her income and monthly expenses; Mother did not comply. When offered assistance with her budgeting, Mother responded she did not need help.

Mother did not always have an adequate amount of food for herself and the baby, and the social services aide was concerned M.K. was not being fed. Some days the social services aide would arrive at Mother's house at 10:00 or 11:00 a.m. and Mother and M.K. would just be getting up. The social services aide observed Mother would not attempt to feed M.K. unless the aide suggested he be fed.

In October 1988, the social services aide and Mother went to the grocery store together. The social services aide purchased two boxes of infant cereal. Five days later, the social worker checked the cupboard at Mother's house and found neither box of cereal had been opened. When asked, Mother indicated that M.K. did not like the cereal, even when mixed with fruit. The social worker mixed a bowl of peaches and cereal and M.K. ate the entire bowl. The social worker then mixed another bowl of peaches and cereal and he ate another bowlful.

The social worker was also concerned Mother was not feeding the child. Mother indicated that at times she was not hungry and would not eat. The social worker surmised that Mother would not feed M.K. when she was not preparing anything for herself.

In early December 1988, the social worker visited Mother's home. M.K. had bronchitis but was wearing only a diaper. The social worker explained to Mother that M.K. should be wearing more clothing. Mother indicated the house was warm enough for what he was wearing; the thermostat was set at 60 degrees.

After a year of assistance, the social services aide concluded that Mother's parenting skills had not improved, particularly Mother's ability to stimulate M.K. The social worker was also concerned about M.K.'s welfare because she had not observed improvement in Mother's ability to stimulate the child. Between June and December 1988, the social worker had not observed any significant improvement in Mother's parenting skills: Mother was not taking M.K. to the doctor when he was sick and was not feeding him properly.

In early December 1988, Mother informed the social services aide that Moth-

er's brother from Washington State would be visiting. Mother explained her brother had told her to pack because he was going to take her back to Washington with him. The social worker was concerned about Mother's leaving because the agency had been working closely with Mother and Mother clearly did not have the resources to make such a move. Believing this to be the "last straw," M.K. was removed from Mother's home and placed in foster care on December 8, 1988.

Mother testified that she loved M.K. Mother admitted she did not feed the child his formula as instructed and forgot to give him his medicine. Mother testified she spent her money on cigarettes, cat food, cable television, milk, diapers, bread, and payments on her phone bill.

Mother's sister testified she spent three nights a week at Mother's house because Mother did not like being alone. Mother's sister helped Mother shop and cook because Mother had not been taught to cook. Mother's nieces tried to borrow money from Mother.

Sandra Magrett provided a temporary foster home for M.K. while his foster parents traveled out-of-state for Christmas. M.K. spent Christmas day with Mother. The next day, he was noticeably over-tired, taking a two hour nap in the morning, a three hour nap in the afternoon and going to bed early.

The social worker supervised all the visits in January 1989. Mother was usually asleep when the social worker arrived at 8:30 a.m. After awakening, Mother would sit on the couch for approximately fifteen to twenty minutes. On these visits, the social worker observed the quality of the visit depended upon Mother's mood. Some visits were good and some visits were bad. The social worker explained to Mother that she needed to get on the floor and play with M.K., showing him how to do things. However, the social worker did not observe Mother attending M.K. unless Mother was prompted. During the month of February 1989, Mother's apartment was always clean and Mother was ready for her visit. But during every visit in March, Mother was

either sleeping or resting on the couch. By April 1989, Mother had lost all willingness and desire to follow the recommendations of social services. Mother was clearly frustrated with the court system and partial care.

Before M.K.'s return to Mother for his regular visit, his foster mother would pack three or four diapers for him. Six to seven hours later he would return having had his diaper changed only once. Mother did not have any diapers in the house for M.K.

Although Mother claimed M.K. napped on his visits, upon return to the foster home, the child would go directly to bed. After a visit it would take M.K. a day to calm down. He always clung to the person who brought him to Mother's house and was ready to leave when it was time to return to the foster home.

Mother played well with M.K. on occasion, but was inconsistent. She was not always attentive to his needs and the social worker observed that nurturing was lacking. One day, Mother had a difficult time deciding whether to have her visit with M.K. or go to the Rapid City Mall. After vacillating for a period of time, Mother decided to have the visit.

In January 1989, Mother and the social worker shopped for groceries. The social worker instructed Mother to divide up the food she had purchased and freeze it separately so that it would not have to be cooked all at once. On the next visit, the social worker observed that Mother had put all the food away without dividing it up.

Dorothy Norris, an occupational therapist, evaluated M.K. in March 1989. At the chronological age of sixteen months, the testing revealed M.K. had the fine motor skills of a child twelve months old and the gross motor skills of a child thirteen and one-half months old. M.K.'s grasp patterns were immature, and his right hand was more delayed than the left. Notwithstanding the increased amount of attention he was receiving at foster care, M.K. was still falling behind in his development.

M.K.'s physical therapy evaluation revealed his walk was immature; he had no reciprocal arm swing, which is characteristic of a twelve-month old child. The physical therapist also observed shakiness and poor quality of movement. M.K. had poor muscle tone, poor balance, decreased body awareness, decreased stability and abnormal fixation patterns. He had poor hand-eye coordination, poor visual tracking and difficulty maintaining a focus on static objects. M.K. exhibited excessive drooling, indicative of oral motor problems; his mouth was usually hanging open.

The occupational therapist opined that M.K. had suffered neurological damage to his central nervous system or brain. Consequently, a specific comprehensive developmental program was recommended, including special education, physical therapy, occupational therapy, and speech therapy. Occupational and physical therapy would be required two to three times a week.

M.K. would also require a good home environment. He was in need of a consistent and stable home in which he would be exposed to many different experiences. M.K.'s care-taker would need to be actively involved in the child's therapy. His care-taker would be required to exercise M.K., purchase certain toys and learn to perform difficult therapy techniques with towels and toothbrushes. His care-taker would need ambition and desire.

Because of M.K.'s neurological deficiencies, he would always have problems, but with help, his problems would be less significant. Without treatment, however, he would fall further behind in his development. M.K. would need years of therapy.

In June 1989, a neurological evaluation was done on M.K. He was diagnosed as microcephalic: his head is smaller than a normal child, at or below the fifth percentile. Such children are often mentally retarded or learning disabled. It was concluded M.K. would need special training to reach his already diminished potential. M.K.'s EEG was abnormal, indicating possible future problems with seizures.

M.K. was not able to learn through passive activities; he learned only by being involved in and repeating the activity. His therapy would have to be repetitious. He needed a parent who could follow through with his therapy at home.

In December 1988, Lyn Smeenk was appointed Mother's protective payee. The protective payee established a checking account for Mother which required two signatures. In September 1988, Mother had run up a $500 telephone bill and it took her four months to pay it off.

The protective payee observed significant improvement in Mother's ability to balance her checkbook. In January 1989, he gave Mother a notebook in which to record how she spent her weekly $25 allowance. Initially, Mother did fairly well in recording her expenses, but her accounting practices began to slacken after only a couple of months. By September 1989, the protective payee observed no improvement had been made in Mother's recording of her expenses. She was virtually unable to account for her money. Her allowance was generally gone in a day or two. Cigarettes were Mother's major expense; she smoked a pack a day. The protective payee feared Mother would be unable to plan ahead and budget her income. This raised concerns over whether Mother would be able to provide the basic necessities for M.K. on a regular basis.

In January 1989, Lyn Smeenk was appointed M.K.'s special advocate/guardian ad litem (CASA). Between January and June 15, 1989, the CASA worker was present for almost every home visit between Mother and M.K. The CASA worker testified Mother loved her son, but she did not devote sufficient time to him. At times the CASA worker observed good parent-child interaction; other times he observed dangerous neglect. On one visit the social worker told Mother not to pull M.K.'s bottle out of his mouth. A few minutes later, Mother did it. The social worker then told Mother not to take the child outside without a snowsuit. A few minutes later, Mother did it. Mother did not notice when M.K. put a plastic toy in his mouth.

By June 1989, the CASA worker observed that Mother's parenting skills had improved. She kept better watch of M.K.'s actions and spent more time with him, although the amount of time was still inadequate. Mother also purchased new toys for M.K. and took special note when he was sick.

Jim Maas, a psychiatric social worker employed by the West River Mental Health Center, provided individual counseling for Mother. Mother was confused about why she was in counseling and why M.K. had been removed from her care. Mother did not associate M.K.'s removal with her inappropriate parenting. The counselor found Mother to be dependent on others because of her low-level social-adaptive functioning.

The counselor observed Mother with M.K. once a month for the months of January, February and March 1989. During the January visit, Mother's parenting skills were inconsistent: she would pick M.K. up and hold him for a few seconds, then set him down; she would give him his bottle for a few seconds, then pull it out of his mouth. Mother was not nurturing with M.K., which the counselor attributed to Mother's inability to concentrate. Mother failed to check the child's diaper.

Prior to the February 1989 session, the counselor told Mother to check M.K.'s diaper and hold him more consistently. Mother's parenting skills were significantly better during the February observation. Prior to the March 1989 session, the counselor did not review parenting skills with Mother. Mother failed to check M.K.'s diaper, but otherwise, Mother's interaction with the child was good.

Throughout his involvement with Mother, the counselor discussed vocational training at the Northern Hills Training Center in Spearfish, South Dakota. It was the counselor's belief that vocational training would assist Mother in becoming more adaptive in her social functioning and personal growth, which in turn would help her parenting skills. Mother did not want to leave Belle Fourche, South Dakota to attend the training center, even though it was only ten miles away.

Mother performed fairly well in a structured program with supervision; however, when there was no supervision, Mother did not carry through with her instructions. The counselor concluded Mother could not live or take care of M.K. without supervision. In April 1989, the counselor recommended Mother and M.K. enter adult foster care where they both could be constantly supervised. However, such a program was not available and Mother was not interested in living with supervision.

Even with individual counseling sessions, Mother's progress was minimal. She made no changes and found it difficult to accept responsibility for M.K.'s removal. Mother was never willing to admit she needed to change or that she needed vocational training. Mother was not motivated to change and was not willing to look at other resources. She never thought the removal of M.K. from her care was justified.

In September 1989, Mother married a man she had known for three weeks. The counselor questioned Mother's judgment and impulsivity. The dependency features of Mother's personality may have caused such improvidence.

The counselor concluded M.K. would be in danger if returned to Mother. Mother did not recognize she needed to improve her caretaking ability. Mother had poor judgment, poor memory, a short attention span and correspondingly poor parenting and social-living skills.

In December 1988, Mary Ohnemus became the Social Services supervisor for the Belle Fourche, South Dakota area and took over M.K.'s case. The supervisor observed a visit between Mother and M.K. in April 1989 at the West River Mental Health Center. Mother interacted well with the child during that visit. Visits at Mother's home, however, were not the same; Mother did not play much with M.K. and gave more attention to the supervisor. The supervisor explained to Mother that M.K. had special problems.

In June 1989, Mother, the supervisor, the foster mother and M.K. met with Dr. Kelts, a neurologist. Mother would not make eye

contact when Dr. Kelts addressed her, and Mother started talking to M.K. and did not listen. Afterwards, Mother indicated she had not understood what the physician had told her.

During the summer of 1989, Mother walked M.K. around town in a stroller. Often the supervisor saw them at nap time. After visits with Mother, the child was tired and hungry. Upon return to the foster home, he would eat and then sleep for a longer period of time than normal.

The social worker recommended terminating Mother's parental rights. Social Services had worked with Mother for two years without significant change. Mother was not motivated to change and M.K. could not wait for Mother to make the necessary adjustments. Because of M.K.'s developmental deficiencies, he required a stable care-taker who could meet his special needs. Mother was not able to provide even the basics for M.K. Indeed, Mother was unable to place M.K.'s needs ahead of her own. Mother made bad choices. The CASA worker and protective payee also recommended terminating Mother's parental rights. Mother was unable to take care of her money and plan for the future. She was unable to focus her attention on present activities and was unable to learn from past experiences.

### B.

■ The standard of review on this appeal is set out in two statutes:

First, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." SDCL 15–6–52(a). Second, "[i]f the court finds the allegations of the petition are supported ... by clear and convincing evidence in cases concerning neglected and dependent children, the court shall sustain the petition[.]" SDCL 26–8–22.10.

*Matter of S.L.*, 349 N.W.2d 428, 432 (S.D. 1984). *Accord Matter of D.H.*, 354 N.W.2d 185 (S.D.1984). Thus, "we must determine whether the trial court was clearly erroneous in finding the evidence supporting termination was clear and convincing." *Matter of S.S.*, 334 N.W.2d 59, 61 (S.D.1983).

In applying the clearly erroneous standard we must bear in mind that our function is not to decide factual issues de novo. The question for the appellate court is not whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed.

*Matter of S.L.*, 349 N.W.2d at 432 (*citing In re Estate of Hobelsberger*, 85 S.D. 282, 289, 181 N.W.2d 455, 459 (1970)).

We have carefully examined the findings of fact and with the exception of a few minor inconsistencies,[4] the evidence supports the trial court's decision. Thus, we are not left with a definite and firm conviction that a mistake was made and we affirm the trial court on this issue.

### II.

Mother asserts the termination of her parental rights was not the most narrow means of providing for the best interests of M.K. Mother contends she should have been afforded counseling through additional state programs; specifically, the Intensive Preventive Placement program (IPP) and Adult Foster Care. The IPP program was not available to Mother because there was no IPP counselor in her area. The Adult Foster Care program was not available until approximately June 1990.

■ Termination of parental rights is not conditioned upon exhaustion of every possible form of assistance. *Matter of D.H.*, 354 N.W.2d at 191. *See also Matter of R.Z.F.*, 284 N.W.2d 879 (S.D.1979); *Matter of N.J.W.*, 273 N.W.2d 134 (S.D.1978). When counseling and therapy fail to improve parenting skills, termination of pa-

---

**4.** Several of the trial court's findings misidentify the individual with knowledge of the facts supporting the finding. However, the record supports each finding of the trial court, except one: the trial court found Mother, instead of Mother's brother, used inappropriate teasing when playing with M.K.

rental rights is justified. *Matter of D.H.,* 354 N.W.2d at 191; *Matter of S.A.H.,* 314 N.W.2d 316, 317 (S.D.1982).

■ Ever since M.K. was born, Social Services has counseled Mother, individually and in group settings, to improve her parenting and independent living skills. Not only has Mother not shown any marked improvement, she is not motivated to change. She does not completely understand that it was her inadequate parenting skills which lead to M.K.'s removal, and she is not committed to changing her behavior. Mother has been counseled through all the programs available to Social Services or has declined to participate in programs urged by her counselors. In short, two years of counseling have proven futile. We, therefore, hold the termination of Mother's parental rights was the least restrictive or narrowest alternative available commensurate with the best interests of M.K.

### III.

■ Mother brings to our attention that the trial court failed to follow the provisions of SDCL 26–8–22.8 and argues she was prejudiced by such failure. SDCL 26–8–22.8 provides:

Whenever it appears from the evidence presented at an adjudicatory hearing that the child may be mentally ill or mentally retarded, as these terms are defined in chapters 27A–1 and 27B–1, the court shall suspend the hearing on the petition and shall either:

(1) Order that the child be examined by a physician, psychiatrist or psychologist and may place the child in a hospital or other suitable facility for the purpose of examination; or

(2) Proceed as provided in chapter 27A–9 or 27A–10.

However, the record reveals Mother failed to raise this issue before the trial court. An issue cannot be raised for the first time on appeal. *Mayrose v. Fendrich,* 347 N.W.2d 585 (S.D.1984); *Weaver v. Boortz,* 301 N.W.2d 673 (S.D.1981). Rather, the record must demonstrate that the trial court was given an opportunity to correct the grievance complained of on appeal. *Cooper v. Cooper,* 299 N.W.2d 798 (S.D. 1980).

■ Even if this issue were properly before the court, Mother has demonstrated no prejudice by reason of the trial court's failure to follow the statute. Had it been determined with medical certitude that M.K. was mentally retarded, that fact would weigh in favor of adjudicating M.K. dependent and neglected and terminating Mother's parental rights. Although a medical finding of mental retardation may have dispelled any causal link between M.K.'s nutritional deficiencies and his mental retardation, the fact is, Mother was unable to properly feed and stimulate the child—retarded or not. Indeed, it is clear that M.K. needs consistent and specialized physical, occupational, and speech therapy. Therapy must become a way of life for M.K. in order that he reach his already diminished potential. Mother was clearly unable to meet the needs of a "normal" infant, much less the special needs of a developmentally delayed child. Therefore, the trial court's failure to follow SDCL 26–8–22.8, even if it were reviewable, was not prejudicial error.

We affirm the trial court on all issues.

MILLER, C.J., SABERS, J., and MORGAN, Retired Justice, concur.

HENDERSON, Justice, dissents.

HERTZ, Circuit Judge, acting as a Supreme Court Justice, not having been a member of the court at the time this case was argued, did not participate.

HENDERSON, Justice (dissenting).

Evidence presented at the adjudicatory hearing reflected the child demonstrated signs of mental retardation. SDCL 27B–1–1 defines "mentally retarded" as "any person with significant subaverage general intellectual functioning and deficits in adaptive behavior."

SDCL 26–8–22.8 contains mandatory language. It mandates that a circuit judge provide for a suspension of an adjudicatory hearing "Whenever it *appears* from the

evidence presented ... that the child may be mentally ill or mentally retarded ..." This circuit judge failed to do so. It was error.

SDCL 26–8–22.8(1) and (2) mandate that where the child appears to be mentally ill or mentally retarded that the child be examined by (a) a physician, psychiatrist or psychologist or (b) proceed as provided in Chapter 27A–9 or 27A–10. This circuit judge failed to do so. It was error: a critical state statute was violated. All dispositional matters were, therefore, inherently flawed. Terminating the relationship between parent and child must be met by procedures which meet the requisite of the process clause. *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

A physician never testified at any of the hearings. Medical reports or neurological reports were not submitted into evidence. How, then, absent expertise, can the trial court or this Court know the causes and reasons for this infant's development deficits? The answer is simple: They cannot. They are medically flying blind and the sky of certainty and truth is filled with fog.

Sadly, and lacking in education to do so, a Ms. Shoemaker relied upon "assumption in the causes and reasons for this infant's developmental deficits." Essentially, the blame was centered upon the mother. Biological factors, i.e., genes, chromosomes, and cellular activities were never explored, evidentiary-wise.

A sunshine of facts bolted through the fog when Dorothy Norris, a registered occupational therapist, testified at the April, 1989, "Review" Hearing (subsequent to the Dispositional Hearing) that the infant's developmental deficits could be attributed to neurological problems. Obviously, this type of medical knowledge should have been brought forth during the adjudicatory stage. A neurological examination was performed by a neurologist; this was at the suggestion of Dorothy Norris; thereupon, it was determined through the testimony of one Mary Ohnemus that the neurological finding was that the child was diagnosed as a microcephalic (small headed,

reflecting mentally retarded in most instances). All of this medical information, by state law, should have been produced at the adjudicatory hearing. If the correct procedure had been followed in the adjudicatory hearing, mother would not have lost her child in a dispositional hearing. A scenario could very well have been that, instead of this child severed in every relationship from her forever, she and the child could have seen one another in a hospital, institution or a social setting. Mother has, by a judicial error, been sentenced to life without her child.

Freedom of personal choice in matters of family life (Dear God, I want to see my child! I love my child!) is a fundamental liberty interest protected by the Fourteenth Amendment. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606 (1982).

State intervention to terminate the relationship between a parent and a child must be accomplished *by procedures meeting the requisites of the due process clause. Lassiter v. The Dept. of Social of Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

Here, the plain error doctrine should be invoked. A fundamental liberty interest is involved: The separation of mother from child and child from mother all during their lifetimes. SDCL 23A–44–15 provides:

Plain errors or defects affecting *substantial* rights may be noticed although they were not brought to the attention of the court. (emphasis supplied mine).

It is obvious why the state statute attends; it is to prevent miscarriages of justices. Should this mother lose her child forever because a lawyer did not raise the issue before the trial court? I think not. This mother, with an IQ of 68, should not forfeit her legal rights due to (1) a judicial error and then (2) an attorney's error. It is, simply, not just.

A fatal error of practical and legal logic exists in the final paragraph of the majority opinion. Said paragraph, a "wind-up" of the unappreciated issues and authorities before us, fails to appreciate the harmful consequences of the adjudicatory phase in

this case. Simply, an examination of the child by a qualified physician would have demonstrated that the child was mentally retarded and that the mental retardation was, in all likelihood, hereditary. If this is a correct platform of legal thought, then, at the adjudicatory stage the hearing should have been suspended and other alternatives should have been explored, alternatives far short of terminating a fundamental liberty interest at a later dispositional hearing. Retarded or not—mother and/or child—a fundamental liberty issue is at stake; retarded people are entitled to procedural safeguards which assuredly includes a *medical* diagnosis so an intelligent cause of legal action may be pursued. These unfortunate, biologically deprived people need social help and love, not separation forever! Their rights simply do not "evaporate." *Santosky, supra.* "It is hazardous, however, to assume that moving a child from an imperfect home will benefit the child." *Santosky, supra.* Accord: *In Interest of S.L.H.,* 342 N.W.2d 672, 677 (S.D.1983); *Matter of M.S.M.,* 320 N.W.2d 795 (S.D.1982).

Should people of low IQs have any less legal rights than those of high IQs? Love is for whom? Children are for whom? The State?