993 A.2d 675

**In re SHIRLEY B., Jordan B., Davon B. and Cedric B.**

**No. 1533 Sept.Term, 2009.**

Court of Special Appeals of Maryland.

April 27, 2010.

Matthew H. Fogelson (Paul B. DeWolfe, Public Defender, on brief), Baltimore, MD, for Appellant.

Ann M. Sheridan (Douglas F. Gansler, Atty. Gen., Baltimore, MD, Shondriette D. Kelley, Riverdale, MD, on the brief), for Appellee.

Panel: ZARNOCH, GRAEFF, and ALAN M. WILNER (Retired, Specially Assigned), JJ.

GRAEFF, Judge.

Appellant, Gloria B., appeals from orders issued by the Circuit Court for Prince George's County, which changed the permanency plan for Ms. B.'s four children, Shirley B., Davon B., Jordan B., and Cedric B., from family reunification to adoption.

Ms. B. presents one issue for our review:

.

Did the trial court err by changing the permanency plans for all four children from reunification to adoption?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Ms. B. and Ronald T. are the biological parents of Shirley B. (born May 6, 1997), Davon B. (born December 22, 1999), Jordan B. (born April 11, 2001), and Cedric B. (born August 30, 2004).[1] In August 2005, the Prince George's County Department of Social Services (the "Department") received a report that the four children "were not being properly supervised," were living in "unsanitary conditions," and were not attending school regularly. Additionally, there were allegations that the children's oldest sibling, Dion B., who is not a party to this appeal, sexually abused the younger siblings. Dion B. was removed from the home and placed with a grandparent.

The Department began to provide services to Ms. B. and her children, which included helping Ms. B. obtain housing and temporary cash assistance. The Department also referred Ms. B. for a psychological evaluation "to obtain information regarding her cognitive and emotional functioning." Dr. Sybil Smith–Gray examined Ms. B. on September 8, 2005. In her report, she began by setting forth information that she had received from the Department, that Ms. B. was "well bonded and attached to her children," and she was "responsive to agency intervention and directives regarding her family's needs," but "because of apparent cognitive limitations[,] there are concerns about her ability to sustain her efforts to provide adequately for her children and to parent effectively with consistency." After testing Ms. B., Dr. Smith–Gray concluded that Ms. B.'s "cognitive functioning indicates her problem solving abilities to be in the mildly retarded range." She continued:

---

1. Mr. T. did not participate in this appeal.

Because of her cognitive limitations Ms. [B.'s] problem solving approach appears to be primarily affect driven. She is likely to rely heavily upon her feelings in arriving at conclusions and making decisions about any given situation because she has difficulty in carefully thinking through possible solutions. Clearly this can be problematic in child rearing, which requires fluid reasoning in response to oft changing circumstances.

Dr. Smith–Gray further noted that Ms. B.'s "cognitive limitations are capable of impinging upon her ability to sustain adequate care for her children over time without external support and intervention."

The Department referred Ms. B. to the Division of Rehabilitation Services ("DORS") for individual counseling,[2] and it referred the entire family for family therapy. Ms. B. did not attend DORS, and neither she nor her children received counseling. Ms. B. also allowed her temporary cash assistance ("TCA") to lapse, and she did not renew it.

On February 6, 2007, the Department filed separate Child In Need of Assistance Petitions for each of the four children in Ms. B.'s care.[3] The master read into the record the Department's amended petition regarding Shirley as follows:[4]

---

2. DORS is a unit within the State Department of Education. It "has a vocational rehabilitation program that provides career assessment, vocational training, assistive technologies, and job placement services." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 484 n. 2, 937 A.2d 177 (2007).

3. A child in need of assistance ("CINA") is defined as
   (f) ... a child who requires court intervention because:
      (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
      (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.
   Md.Code (2006 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article.

4. The Department filed separate petitions, and the court issued separate orders, for each child involved in this appeal. For purposes of appeal, because the petitions and orders were substantially similar, we will

DSS has been working with the child's family since August, 2005. At that time there was no food in the home for the children. . . . The child was not attending school regularly. She and her siblings were dirty.

In 2006, DSS obtained Section 8 housing for the family. Referred the . . . child's mother to DORS . . . for individual counseling, and the family for family therapy, and helped the mother get TCA. The child's mother had let her TCA lapse and did not get it renewed. She never attended DORS, and neither she nor the children attended counseling.

On or about 2–4–07, the child's mother and father got into a fight in the home in front of the child and her siblings. The child got a knife. The child's older brother, [Dion], removed the knife from Shirley.

The child's mother allowed some adult relatives to stay in the family home. The child's mother and father were engaging in sex in the bedroom while Shirley was believed by the parents to be asleep, but she was not. The child's paternal aunt was engaged in a sexual act on the sofa in the living room.

Shirley states her father and his brother, sister, and sister's boyfriend have used CDS in her presence.

On February 6, 2007, there was inadequate food in the home for the children. The child's mother is cognitively limited, and the child's father has a substance abuse problem.

The Department requested that the court order the children into its "care and custody . . . pending further investigation."

That same day, a hearing was held on the issue of Shelter Care for the children.[5] The master made the following findings in its Shelter Care Order:

---

refer to the orders and proceedings in Shirley's case, unless otherwise noted.

5. The transcript of this proceeding is not part of the record on appeal.

> [T]he evidence presented sustained the finding that continuation of the aforesaid child in the child's home is contrary to the child's welfare and that it is not now possible to return the child to that home because the following circumstances exist[ ]: DSS has worked with the family since August 2005. The incident occurring on 2/4/07 with Shirley responding to domestic violence between her parents by threatening the family with a knife caused a flood of adverse information to suddenly become known about the home environment, including domestic violence, drug use, sexual misconduct and other people living there. . . .

The master found "that the evidence presented sustained a finding that because of the emergent nature of the situation, reasonable efforts could not be made to prevent removal" of the children from the home. The court ordered that all four children be placed in the temporary custody of the Department pending a further hearing, and that the parents be afforded visitation rights.

On March 6, 2007, a hearing was held before a master in the circuit court to determine whether the children would be adjudicated CINA. Counsel for the Department proffered that Shirley would testify about the following events:

> [S]he could definitely testify as to the events that took place allegedly on February 14, 2007 about the fight, her obtaining the knife, and she could talk about her motive for wanting to obtain the knife, and that was to de-escalate the situation. However, that had the potential to escalate the situation and the problems in the home.

> . . . she could testify about her present sense impression of being awake and conscious during the time that her parents were engaged in a sexual act at one point. I could definitely proffer—or put her on the stand—I would proffer to the Court that Shirley would definitely testify competently as to her perceptions of her paternal aunt engaging in the sexual act on the living room sofa. And with regards to that, she would also—I would proffer to the Court that Shirley [B.] under oath would testify with regards to the use of CDS in the home and by whom the CDS was used.

Counsel for the Department further stated that the Department could put on an additional witness who would testify to "the issues that are found in Count I with regards to referral to DORS, assistance in obtaining Section 8 housing, assistance obtaining TCA assistance." Moreover, the witness would testify that "the children were coming to school 'dirty,'" "the conditions of the home when she's visited the home," and "the number of . . . people that were in the home when she made those visits."

Counsel for Shirley B., Davon B., Jordan B., and Cedric B. advised the court that, once she completed her investigation and interviewed the children, she "determined that [she] had a conflict between Shirley and her younger siblings," and she was withdrawing her appearance for Davon B., Jordan B., and Cedric B. The master continued with the hearing in Shirley's case and postponed the hearing regarding the other children.

The Department argued that the proffered testimony "amounts to a substantial amount of evidence that would make for a CINA finding. . . ." Counsel for Shirley requested that the Petition be sustained. Counsel for Ms. B. and counsel for Mr. T. indicated that they did not want a full hearing, and they did not oppose the findings. The Department requested that "Shirley be declared to be a child in need of assistance and remain in the care and custody of the Department of Social Services," that "the parents be granted liberal and unsupervised visits with Shirley individually," and that the parents get individual and family counseling and attend parenting classes. The Department further requested that Mr. T. attend a substance abuse program and Ms. B. attend a program offered by DORS.

The master found Shirley to be a child in need of assistance, stating as follows:

> And there is a very definite domestic violence issue here that just runs through everything. Shirley's—the allegations that have been sustained as to Shirley as to—and I find her motivation to be absolutely normal. I mean this is what kids do all the time when they are just so tired of the

domestic violence between their parents that they cannot think [of] anything but to threaten them with so much force that they'll stop.

And this is the first, and going to be to me, one of the absolute criteria for Shirley's return. That you both not only follow through with all the other recommendations, but also have domestic violence evaluations, and therapy, and couple's therapy on those issues. And we're going to stop this.

I have no problem at all with your being an intact family, and that's who we're going to deal with. You as an intact family. But if the domestic violence cannot and does not stop, and if the other substance abuse issues, follow through issues, and everything else doesn't improve, Shirley is not going to come home any time soon. The ball, Ms. [B.] and Mr. [T.], is in your court. And what needs to happen to change it is not something that Shirley has any control over. Only you all have control over it.

I find Shirley to be a child in need of assistance. Mother is unable through both her limitations and her history to follow through with the services ... in place from 2005 on. That Mr. [T.] has a substance abuse problem that needs attention and remediation. That there are domestic violence issues that must be addressed and must be stopped, as well as just simply behavioral type issues, learning how to run a household that is safe and where children, all the children, are going to be cared for, fed, and not exposed to those things that they have every right to not be exposed to, the sex, the drugs, alcohol, all of it.

On March 13, 2007, the master issued its recommended Adjudication and Disposition Hearing Order finding Shirley to be a CINA. The master explained its reasoning as follows:

1. Mother, based on the allegations sustained, is unable through both her limitations and history to follow th[r]ough with the services that were put into place from 2005 on; so that this child had a safe and non neglectful home environment. The home is chaotic with

domestic violence, lack of sexual boundaries and drug use by several people that [were] there most of the time including her father. The services DSS recommended were available and in place but not used with the exception of the Section 8 housing voucher.

2. Mr. [T.] has a substance abuse problem that needs attention and remediation.

3. Domestic violence is in the home to the extent that Shirley retaliated with her own violence by picking up and us[ing] a knife to get her parents to stop their fight. This shows that she has been exposed to violence to the extent that she is convinced that it is the way to act.

4. The family has very little concept of the need to not share their home with other relatives and this has expanded the problems caused by overcrowding and lack of boundaries by these adults in their conduct.

The master recommended that Shirley remain in the care and custody of the Department "for a more appropriate placement and pending further disposition...." The master's findings subsequently were adopted by the court.

On March 20, 2007, a hearing was held on the CINA petitions for Davon B., Jordan B., and Cedric B.[6] The court found all three children to be CINA for the same reasons that the court found Shirley B. to be a CINA. The court also ordered Davon B., Jordan B., and Cedric B. to remain in the custody of the Department pending further disposition of this case.

On September 10, 2007, after a permanency plan review hearing was held for all four children, the court detailed the efforts made by the Department to help the children and provide services to the parents. The Department referred Ms. B. to a domestic violence intervention program, to Family Tree for home-based parenting classes, and to Melwood to inquire of the necessary steps to participate in a training

---

6. The transcript of this proceeding is not part of the record on appeal.

program.[7] The court found that Ms. B. had not followed up on the services recommended by the Department. She had not attended the domestic violence counseling that was recommended, and she had not started parenting classes. Ms. B. indicated that she had left messages with Melwood, but she had not received a response. The court noted that visits between the children and Ms. B. had occurred in the home while Mr. T. was present, which was in direct violation of the court order regarding visitation due to concerns regarding Mr. T's substance abuse and domestic violence. Nevertheless, the court found that the children's permanency plan was to remain reunification with the parents, with implementation to be achieved by February 2008.

On January 23, 2008, after another permanency plan hearing, the court found that the Department had made reasonable efforts to finalize the permanency plan. Ms. B., however, had not followed through with the individual counseling and parenting classes to which she had been referred. She had not kept in contact with the Department during the review period.[8] The court found that the children's "permanency plan is Reunification with implementation of the permanency plan to be achieved no later than June 2008." It ordered that the Department provide or make referrals for a psychological evaluation of Ms. B, with individual therapy, a DORS evaluation and "further exploration of Melwood" for Ms. B. The court noted that "[b]oth parents were informed about the purpose of the next hearing and that a change in the permanency plan may occur if there is still little progress toward reunification."

Pursuant to the court's order, the Department referred and paid for Ms. B. to receive individual therapy from therapist Debbie Austin. The therapy with Ms. Austin was intended to

---

7. Melwood is an organization that assists individuals with intellectual and developmental disabilities.

8. The Department noted, in its January 4, 2008, letter to the circuit court, that it was difficult for the Department to contact Ms. B. because her prepaid cell phone numbers frequently were not in service.

"address the mental health needs of [Ms. B.] as well as the domestic violence issues and parenting skills." In a therapy progress report dated May 27, 2008, the therapist opined that Ms. B. was "not ready at this time to be reunited with her children." The report explained:

[Ms. B.] has been seen 10 times and has been compliant with her appointments. Although she attends each week, she is unable to process information or discuss issues that potentially could surface once she is reunited with her children. This weakness appears related to her cognitive limitations.

A dated (September 2005) psychological evaluation for [Ms. B.] placed her in the mildly retarded range and stated that, "Because of her cognitive limitations [Ms. B.'s] problem solving approach appears to be primarily affect driven. She is likely to rely heavily upon feelings in arriving at conclusions and making decisions about any given situation because she has difficulty in carefully thinking through possible solutions[.] ... this can be problematic in child rearing ...[.] Consequently, her decision-making and coping abilities can be become impaired when she is overwhelmed by emotionally distressing situations." This writer's experience in treating [Ms. B.] is consistent with the aforementioned and it is unlikely that [Ms. B.] would be able to adequately cope with the ever-changing and increasing demands of parenting at this time.

[Ms. B.'s] therapy involves a treatment modality that is concrete, structured and solution focused. She responds best to worksheets, but does not fully understand what the exercises are requesting of her, based on the way she answers the questions. For example, [Ms. B.] thinks that by attending these sessions she is going to automatically get her children back, even though this writer has explained to her that there are other requirements that need to be met. [Ms. B.] clearly loves her children, but her ability to properly care for them is highly questionable. Therefore, it is this writer's opinion that she is not ready at this time to be reunited with her children. Further, it is unlikely that

more sessions beyond the authorized 12 would make a significant difference in this writer's assessment of [Ms. B.], and for that reason, additional sessions are not being requested. To what extent [Ms. B.] can independently care for her children remains unresolved, and it would be in her children's best interest for the department to assess this thoroughly before a decision for reunification is made.

On June 16, 2008, another permanency planning review hearing was held.[9] The Department, the children, and both parents recommended that the permanency plan be changed to reunification solely with Ms. B. Despite these recommendations, the master recommended that the children's permanency plans be "Adoption with implementation of the permanency plan to be achieved no later than December 2008." The master stated that there "has been little progress toward reunification." The master explained its conclusion as follows:

At the last hearing, the father, [Mr. T.], indicated that he wanted reunification to occur with the mother. He had not made any efforts towards reunification and indicated that his financial difficulties prohibited him from adhering to the Court's orders. He further indicated that he had moved out of the family home so that the mother could work towards reunification.

* * *

The Court is concerned about Ms. [B.'s] ability to care for her children. Ms. [B.'s] previous psychological evaluation revealed that ["] . . . . Ms. [B.] has cognitive limitations that may impinge upon her ability to sustain adequate care for her children over time without external support and intervention. Her decision-making and coping abilities can become significantly impaired when she is overwhelmed by emotionally distressing situations." Ms. [B.'s] cognitive functioning indicates her problem solving abilities to be in the mildly retarded range. Although Ms. [B.'s] academic functioning across all content areas were in the deficient

---

9. The transcript from this hearing is not part of the record on appeal.

range, she should be able to acquire fundamental literacy and math skills that better support routine daily living. Ms. [B.'s] therapist also provided a progress report to the Court. In summary, she agreed with the psychological evaluation that was completed in 2005 and opined that it is unlikely that Ms. [B.] would be able to adequately cope with the ever-changing and increasing demands of parenting at this time. The therapist further indicated that Ms. [B.] is not ready to be reunited with her children.

The master recommended, among other things, that the Department "shall file a petition to terminate parental rights no later than July 16, 2008."

On June 25, 2008, Ms. B. filed Exceptions to the Master's Report and Recommendations, objecting to the master's finding that the children's permanency plan should be adoption. Ms. B. argued that the master's decision was premature because "the court failed to recognize and treat as a compelling reason for continuing a plan for reunification that, although some services [had] been offered to the family, these services were not particularized to meet the abilities and needs of this mother." Ms. B. further argued that, although the "court recognized that the mother's academic functioning appeared to be in the deficient range and that the mother should be able to acquire fundamental literacy and math skills that better support daily living," the court "has not previously ordered literacy classes, math tutoring or other services particularized to this mother ... to aid in reunification." Ms. B. requested that the circuit court decline to ratify the recommendations of the master.

On December 2, 2008, the circuit court held a hearing on Ms. B.'s exceptions to the master's recommendation to change the children's permanency plan from reunification to adoption. Counsel for Ms. B. argued that the Department had been aware of the mother's disability, but it had not "properly addressed this disability, thus failing to make the reasonable efforts towards reunification...." Counsel for Mr. T. supported "the mother's continued efforts for reunification." Counsel for Shirley asserted that a permanency plan of "TPR

adoption" was "not in her best interest." She explained that "she's been in her placement for a little over a year, and she's happy there, but it's not a preadoptive placement," and changing the plan to "TPR" would force "her to change to a new placement, change to a new school, and then make a decision in less than six months as to whether the new family that she's with would be somebody she would want to spend the rest of her life with ... and I don't think she's prepared to make that decision." Counsel for Jordan B., Davon B., and Cedric B. had "just [been] appointed," and he stated that a change in the permanency plan was not appropriate until he had "more information."

Natalie Gimperling, a licensed clinical social worker, testified that she worked in the Department's Adoption and Guardianship Unit, which finalizes adoptions for clients whose permanency plans have changed to adoption. She was assigned to the case in July 2008, when the permanency plan was changed to adoption. Ms. Gimperling testified that the Department began providing services to Ms. B. and her children three years earlier, in 2005, to "preserve the family unit without the children having to be removed from the home." Those services included obtaining temporary cash assistance, food stamps, and housing. The Department had concerns with Ms. B.'s "ability to clearly understand and process information regarding the children," and Ms. B. "wasn't able to come up with clear, concrete, solutions to problems that were presented to her." Ms. Gimperling had concerns regarding Mr. T., including "substance abuse issues" and "domestic violence concerns." Domestic violence assessments were performed on Mr. T. and Ms. B., and a domestic violence intervention program was recommended, but neither parent followed through.

Ms. Gimperling testified that the "primary barrier" for Ms. B. to achieve reunification with her children was her "cognitive limitations." Other issues included housing and "Mr. T. being in the home." To assist with Ms. B.'s "cognitive deficits," the Department had referred her to the Developmental Disabili-

ties Administration ("DDA"), DORS, and Melwood.[10]  Ms. B. had an upcoming intake appointment with DORS.

Ms. Gimperling then testified regarding the needs of each child.  Davon B., age nine, was placed in a "therapeutic foster home" in June 2008, and he was "doing extremely well in school."  There were some behavioral concerns "surrounding ADHD," but he was receiving therapeutic and medication management services.  Davon B. was "thriving" in his foster home.

Jordan B., age seven, was placed in a therapeutic foster home with his brother Cedric, age four, and they had "settled down and adjusted quite well to the home."  Jordan was developmentally delayed and had "speech and articulation issues," which required both school and outpatient based speech therapy services.  Jordan had adjusted well to school.  Cedric also was developmentally delayed and had some "speech and articulation issues."

Shirley B., age 11, was in the "borderline intellectual range," and she received special education services in school.  From November 2007 through February 2008, Shirley was not "compliant with her school work," and at times, she became physically aggressive in her classroom.  Since August 2008, she experienced "some difficulties in the area[s] of reading and math," but her behavior had been a "total turn around."  Shirley was respectful to the teachers and there were no problems in the classroom.

Ms. Gimperling testified that, at that time, it was not in the children's best interests to return to Ms. B.'s care.  To improve the situation, Ms. B. would need additional services:

> For Ms. B. implementing if she is approved for services through DDA or DORS, I mean Melwood is now under DDA, they can implement in-home parenting classes and

---

**10.**  Ms. Gimperling explained that DORS provides vocational programs that teach skills to enable an individual to hold a job.  DDA provides "supportive services for everyday life."  And, as indicated, Melwood is an organization that assists individuals with intellectual and developmental disabilities.

almost like a wrap around support system, but she wouldn't be the parent. It would just be support for her. Having something like that in the home would, I guess, improve the situation for reunification.

Ms. Gimperling stated that Ms. B. was on the waiting list for treatment at Melwood, but she could not estimate when Ms. B. might begin to receive services.

Ms. Gimperling explained that DDA had "specialized parenting classes and ongoing support services through their program." Although Ms. B. had attended therapy through Community Counseling and Mentoring Services, it was not appropriate for her needs. When questioned about the extent of services that would be necessary to return the children to Ms. B., Ms. Gimperling testified that "there would need to be ... at least a weekly basis, bi-weekly of someone coming into the home, providing education for basic living skills, maintaining the appointments for the kids ... ongoing contact with the school system ... [and] just the daily living skills that all parents need to provide care for their kids." When asked if these services were available through DDA, she could not say, noting that "it's all based on funding approvals. If they can't approve the funding, then that service is not going to be available for her."

Margaret Harris, a Court Appointed Special Advocate,[11] testified that she was assigned to Shirley's case. Shirley was well cared for in her current foster home, and she was happy and "stabilized in school." Shirley had not told Ms. Harris that she wanted to be adopted.

The court sustained Ms. B.'s exceptions. Although it rejected the argument that the Department had not made reasonable efforts toward reunification, it found that it was in the

---

11.  "A Court Appointed Special Advocate ('CASA') has been described as 'a trained community volunteer, appointed by a judge, to represent the best interests of children in cases that come before the court due to alleged abuse or neglect.'" *In re Billy W.*, 387 Md. 405, 410 n. 1, 875 A.2d 734 (2005) (quoting NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION, JUDGE'S GUIDE TO CASA/GAL PROGRAM DEVELOPMENT, 15 (2004)).

children's best interests for the permanency plan to remain reunification with Ms. B. Noting that the permanency plan should be the same for all four siblings, the court ruled as follows:

> The Court believes that it's significant that none of the evaluations that I read or the reports absolutely stated that mother would not be able to parent. If you look for that line, it's not absolutely there. It's suggested that you need to look at something further.
>
> The Court believes that there has been a delay in linking mother to services such that notwithstanding the amount of time that each of the respondents has been in foster ca[r]e, the Court believes that it continues to be appropriate that reunification would be the permanency plan. That plan is in the best interest of each of the respondents presently.

The court continued:

> In indicating that reunification is the appropriate permanency plan, the Court won't specifically link it to the suggestion that there has been a delay in linking mother with services because it has to be understood that anything that the Court might order her today, compliance of the parents with what's ordered, provision of the services, accessing those services, and corroborating with those services, does not necessarily mean that once the services are provided and are in place that the Court would be satisfied that reunification is still viable. But, it's just that I think mother needs a chance, and right now is not the time to cut off that chance, that opportunity.
>
> The Court notes and finds that all of the children are currently in placements that meet their developmental therapeutic needs, and they are responding to those placements. **The Court finds that the department has, indeed, made reasonable efforts towards achieving reunification, notwithstanding the delay in linking the services.**

(Emphasis added).

The court listed the efforts with respect to Ms. B. as follows:

The department provided mother assistance that helped her obtain a Sec[tion] 8 voucher and to receive temporary cash assistance. The department assisted mother with her DDA and DORS application[s]. The department accomplished appropriate placement for each of the respondents, which addresses that respondent's particular needs. The department has provided weekly visitation with mother, and opportunities for visitation with father. The department paid for individual mental health counseling for mother, [albeit] found ultimately not to be appropriately directed to her cognitive functioning and her cognitive needs. The department obtained the psychological evaluation of mother. The department monitored the educational and therapeutic needs of each respondent and assured that each received appropriate services directed towards meeting those needs of the respondents.

The court stated that Ms. B. had cooperated with the Department, and her "progress has been within her cognitive where with all [sic] and consistent with what the department has known at a particular point in time." It found that Ms. B. needed "specialized parenting classes that are only available through the Developmental Disabilities Administration or Melwood in light of her diagnosis and the special needs of each child," but these services "are not yet available and they would appear to be, given mother's cognitive functioning, a critical element of her ability to have the children with her." The court found that "it's contrary to the best interest of each of the respondents to reunite any of the respondents with mother or father." It continued each of the respondents in the care and custody of the Department, and it ordered "that the Department of Social Services continue to monitor the status of any application with the Developmental Disabilities Administration and [DORS]."

On December 16, 2008, the circuit court issued four orders sustaining Ms. B.'s exceptions to the master's report and recommendation, finding that "[t]he plan of Reunification is in the best interest" of the children. The court found that "[n]one of the evaluations or reports produced by the Depart-

ment absolutely state that mother would not be able to parent." The court further found that "[t]here has been a delay in linking Mother to services targeted at her particular needs, such that, notwithstanding the amount of time Respondent and her siblings have been in foster care, it continues to be appropriate that Reunification would be the permanency plan."

On June 25, 2009, the circuit court held another permanency plan review hearing. Ms. B. filed a Motion *In Limine* to exclude "the April 28, 2009 Report of Neuropsychological Evaluation and Family Clinical Interviews of the Mother, [Ms. B.], performed by Dr. James E. Lewis." She argued that the report was inadmissible based on the psychologist-patient privilege. *See* Md.Code (2006 Repl.Vol.), § 9–109 of the Courts and Judicial Proceedings Article ("C.J.P."). The court granted Ms. B.'s motion "with regard to those portions of the evaluation that relate to communication between Dr. Lewis and Ms. [B.]," and "as it relates to the communications and conclusions or recommendations that rely upon those communications and any diagnoses arising out of those communications." A redacted version of the report, which addressed the four children, was admitted into evidence.

Dr. Lewis observed that Jordan "displays restlessness and fidgetiness, as well as difficulties with focusing and sustaining his span of attention and concentration." Dr. Lewis determined that, despite taking ADHD medications, Jordan and Cedric continue to have symptoms of severe ADHD: "Both Jordan and Cedric are observed to have the clinical symptoms and features of a DSM–IV: Severe ADHD, Combined Type (symptoms of both the Inattentive and Hyperactive/Impulsive Types)."

The boys advised Dr. Lewis that Mr. T. physically beat them and that Ms. B. was unable to control his behavior. Jordan stated: "Our dad would hit all of us with his hand or a big fat belt … he beat us on our butts and legs with the belt … if our mom tried to stop him, he'd hurt her, too…." Davon added: "Daddy would hit me, Shirley and Jordan the

most ... he'd leave big red marks and told us that we shouldn't tell at school what he did or he would beat us up or worse." Dr. Lewis concluded that Davon and Jordan suffered from post-traumatic stress disorder, "which appears to be less with Cedric simply because he was younger and does not have the same memories of so many abusive and neglectful experiences as the older children."

Dr. Lewis interviewed Shirley separate from her brothers. He concluded that Shirley was depressed and suffered from post traumatic stress disorder. Shirley advised Dr. Lewis that Mr. T. was abusive toward both Ms. B. and the children. She stated that Mr. T. "hurt our mom really bad," explaining that he would hit "her with his fists and knock her down." Mr. T. also hit the children: "Our dad would hit all of us with the belt ... I remember me and Dion and Jordan and Davon got hit the most...." On one occasion, the police "took [Mr. T.] off to jail," but "our mom would let him come back again and hurt us all over again...."

Shirley advised Dr. Lewis that she assisted her mother by taking "care of [her] little brothers," including "getting them dressed and trying to remind them about their lunches and their books to go to school." She also helped take care of her mother. Dr. Lewis explained Shirley's role in the family:

Shirley presents graphic memories of being an "adult child," sometimes referred to as a "parentified child," seeing her mother as being helpless or at least unable to properly care for herself or the children. However, Shirley is extremely respectful and protective of her mother and never talks about her mother in a way that appears critical or disrespectful. If anything, Shirley presents as "mothering" her mother, Gloria, and is now experiencing feelings of grief and depression because of her (Shirley's) inability to carry on this grossly inappropriate role of mothering her own mother and her younger siblings.

Shirley also advised Dr. Lewis that her older brother Dion raped and sexually abused her on multiple occasions. This occurred when adults were in the house, including her mother.

Shirley told Dr. Lewis that she felt bad "even saying what happened, because people think it was my mom's fault for not taking better care of us."

The Department called one witness. Ms. Gimperling testified regarding the Department's efforts since the last hearing to obtain services for Ms. B. to facilitate family reunification. Ms. Gimperling contacted DORS, which previously had conducted an assessment and recommended that Ms. B. receive vocational services with Melwood. The individual that Ms. B. originally met with, however, had left the agency and that person's supervisor had no record of the notes, so she needed to conduct another meeting. Ms. Gimperling explained that, "[u]nfortunately because of the funding circumstances right now between the State and [DORS], they're not referring clients to [Melwood] at this time because [Melwood] does not have the funding to provide them with that vocational training service." With regard to DDA, she testified:

> I contacted them multiple times during the review period to determine where [Ms. B.] stood on the waiting list. There's four different criteria that someone has to meet ... I guess you could say tiers that someone would be in for qualifying for services, and she's in the second tier. They said because of that, all the people in the first tier go first; second tier still waits, and she's still waiting. They have no idea of when she will be eligible for services.

Ms. Gimperling provided Ms. B. with information about a support group offered through the Association for Retarded Citizens ("ARC") for parents with developmental disabilities. She also referred Ms. B. to Dr. Lewis for evaluation.

After Dr. Lewis' evaluation, Ms. Gimperling followed up on concerns regarding Ms. B.'s health status. The Department scheduled appointments for Ms. B., went to the appointments with her, and helped her get medicine. Ms. Gimperling testified that the Department arranged transportation to Ms. B.'s medical appointments, to the children's educational meetings, and to visits with the children because Ms. B. "was unable to navigate the bus system on her own."

Ms. Gimperling then testified regarding Ms. B.'s contact with the children. During one visitation, Ms. B. told Ms. Gimperling that she hit Davon. The boys were wrestling, and instead of just trying to separate them, Ms. B. hit Davon. Ms. Gimperling spoke with Ms. B. about better methods to handle these situations. Ms. Gimperling's co-worker also had advised that Ms. B. had struck Davon "on multiple occasions." Ms. Gimperling further testified that, as a result of Shirley telling her CASA worker that Mr. T. shared living space with Ms. B., which Ms. B. denied, she was concerned about Ms. B.'s truthfulness.

With respect to potential placements for the children, Ms. Gimperling had not located any potential adoptive parents for Shirley, Davon was moving to a new placement, which could potentially result in adoption, and Jordan's current placement also had the potential to result in adoption. Ms. Gimperling did not indicate whether Cedric had any potential adoption placement.

At the time of the hearing, Ms. Gimperling appeared to have changed her mind regarding the possibility that services could be provided that might make reunification a possibility.[12] When asked what the Department could do in a year to make it possible to reunify Ms. B. with her children, she testified: "I don't know what we could do to make it a safe situation where all the kids would flourish as they are right now."

On cross-examination, Ms. Gimperling acknowledged that, when talking about the possibility for Ms. B. to reunify with her children, it was crucial that she receive services from DDA, DORS, or Melwood. She indicated that this was the only remaining option for services for Ms. B. regarding parenting. Those services, however, were not available to Ms. B. at that time due to funding limitations.

---

12. In December 2008, Ms. Gimperling discussed the possibility of Melwood providing "a wrap around support system" that "would, I guess, improve the situation for reunification."

At the conclusion of the hearing, the court adopted the plan requested by the Department, and it ordered that the permanency plan be changed from reunification to adoption. The court found that it was not "in the best interest of any of the children ... to reunite them with either parent." [13] The court noted that, although Ms. B. had cooperated with the Department, she had

> not received certain education[al] training that would give the Court confidence that the children can be safely in her care ... with mother able to attend to her developmental and educational needs. Additionally, mother does not currently reside in a residence that would accommodate having any of the children with her.

* * *

[W]ith regard to the Court's determination on December 2nd, 2008, that the Department had failed to link [Ms. B.] with services that were consistent with her abilities. **The Court wanted the Department to do more, and the Court believes that the Department has done more.** The Department is at the mercy of agencies that lack necessary funding to provide services that are critical to informing this Court as well as the parties as to the process for [Ms. B.] to acquire skills that are necessary to meet the special needs of Cedric, D[a]von, Jordan and Shirley. Those are special educational needs, as well as developmental needs.

**The Court finds that mother requires services that will allow her to have assistance that will permit her to attend to those needs. The evidence is that mother requires hands-on assistance of the Department to meet her very own personal needs. And the Court finds that mother is not able to access or to negotiate the system that's necessary to provide for the safety of the four children, or to attend to their developmental and educational needs.**

---

13. Because only Ms. B. has appealed, we will reference the court's findings only as they refer to Ms. B.

[W]e don't know how much time it would take for funding to become available to the agencies. We know that now we're 28 months into the life of the children with the Department of Social Services.

The Court finds that the Department globally—the Department has made reasonable efforts to achieve the plan for reunification by referring mother to the Developmental[ ] Disabilities Administration and [DORS], assisting in her preparation of the application and a submission in achieving placement of mother on a second tier waiting list—a waiting list at the second tier.

The Department has made reasonable efforts by attempting to ... determine when mother may be able to receive services, and those efforts have met with an inability of the agency to give a date when services might be available.

The Department's efforts have included determining when mother might be able to be placed with [Melwood], only to find that although there was an assessment done, [Melwood] has lost the assessment. And [Melwood] is no longer receiving—taking clients of [DORS].

The Department's reasonable efforts included contacting the Community Connections Agency to determine if other funds were available for the services that were not accessible through—readily accessible through the Developmental Disabilities Administration and [DORS]. And funds that might have been available had been exhausted by January of 2009, within a ... relatively short period of time after the parties were before the Court.

The Department's reasonable efforts included obtaining a necessary neuro-psychological evaluation in an effort to provide an evaluation that would have otherwise been funded by these other sources, albeit the evaluation that this Court did not review.[14] The Department's efforts included

---

14. As indicated, Ms. B. was evaluated by a psychologist, but she requested that a portion of the report be excluded based on the psychologist-patient privilege.

obtaining a clinical—family clinical interview with regard to the children.

The Department's reasonable efforts included discussing with mother medical issues, assisting her in reactivating her medical assistance . . . arranging for and transporting for medical appointments, including a gynecological examination, as well as an examination to address issues of high blood pressure.

The Department's reasonable efforts . . . [have] included transportation of mother to educational meetings, appointments affecting the minor children, and assisting her in understanding what [is] occurring during those sessions, including assisting her with questioning.

**The Department's efforts have included transporting mother to visits with children. The element of transporting mother and assisting with appointments and scheduling is indicative and representative of the Court's concerns about mother's inability to access or to navigate systems that are more complex with regard to . . . addressing the educational and developmental needs of each of the [children].**

The Department's efforts have included attempting within the limited environment of visitation at the Department to aid mother in learning how to properly direct Davon. . . .

\* \* \*

**And the Court finds that it's in the best interest of each of the [children's] permanency [plans] would be changed to adoption.** The Court finds that it continues to be in the interest of each of the [children] that the Department continue at a minimum to follow up on referrals to the [DDA] and [DORS]. And the Court—the context of that is that each of the children have a strong b[o]nd to their mother.

Who knows? Next month the funding could become available. I don't think it's going to happen, but (indiscernible) we're at the bottom of it all. But at the same time if there is—we know the process. There's a long road from

filing a petition for guardianship and the granting of the guardianship. We know and the Court believes that it's going to be in the best interest of these children if at all possible that there would be continued visitation—that there be a continued contact with mother.

(Emphasis added).

On July 17, 2009, the circuit court issued separate orders of commitment for each of the children, finding that it was in the best interest of the children that the permanency plan "be changed from Reunification to Adoption." The court ordered the Department to continue to monitor the status of Ms. B.'s application for services with DDA and DORS and ordered liberal unsupervised visitation with her children.

This timely appeal followed.[15]

## STANDARD OF REVIEW

In reviewing a circuit court's decision regarding a change of a permanency plan, we employ three related standards:

When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c)] applies. [Secondly,] if it appears that the chancellor erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion.

*In re Yve S.*, 373 Md. 551, 586, 819 A.2d 1030 (2003) (citation omitted).

---

**15.** "[A]n order amending a permanency plan calling for reunification to foster care or adoption is immediately appealable." *In re Damon M.*, 362 Md. 429, 438, 765 A.2d 624 (2001).

## DISCUSSION

■ Ms. B. contends that "the trial court erred by changing the permanency plans for all four children from reunification to adoption." She argues that, because she "was deemed in need of certain services due to her cognitive limitations and the Department had failed to supply any such services," the circuit court erred in finding "that the Department made reasonable efforts toward reunification and the trial court abused its discretion by changing the permanency plan from reunification to adoption."

The Department argues that, in light of the applicable statutory factors, the court properly changed the permanency plan from reunification to adoption because "Ms. B. was unable to provide a safe home environment for her children," arguing that the record showed "a myriad of serious dangers that reunification would pose to the children." The Department further argues that "the court properly determined that Ms. B., due to her limitations, was not able to care for herself independently, let alone provide for her children's various special needs." Finally, the Department argues that it was "not required to provide services that would be futile and doomed to failure," yet it "provided exhaustive services, and attempted to access additional services from other agencies, both prior to the children's removal, and for the more than two years following their removal."

Counsel for Shirley argues that "the trial court properly exercised its broad discretion and acted in Shirley's best interest in changing the permanency plan from reunification to adoption." She asserts that "Ms. B. is unable to provide appropriate care or seek assistance to provide that care," and the "record is clear that the Department has made reasonable efforts towards the permanency plan of reunification," which included "trying to connect Ms. B. with ARC, Melwood, DDA, and DORS," transporting Ms. B. "to Shirley's educational meetings and weekly visitation at the Department and in Ms. B.'s home." Counsel for Davon B., Jordan B., and Cedric B. did not file a brief, but rather, submitted a letter indicating

that the children joined the positions asserted by the Department and Shirley.

The General Assembly has set forth the requisite procedures for children deemed to be at risk. When a child is declared a CINA and removed from the home, the court must "hold a permanency planning hearing to determine the permanency plan for [the] child...." C.J.P. § 3–823(b)(1). "'The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement.'" *In re Joseph N.*, 407 Md. 278, 285, 965 A.2d 59 (2009) (quoting *In re Damon M.*, 362 Md. 429, 436, 765 A.2d 624 (2001)). *Accord In re Ashley E.*, 387 Md. 260, 287, 874 A.2d 998 (2005). It not only "'provides the goal toward which the parties and the court are committed to work,'" it determines the "'[s]ervices to be provided by the local social service department and commitments that must be made by the parents and children....'" *In re Joseph N.*, 407 Md. at 285, 965 A.2d 59 (quoting *In re Damon M.*, 362 Md. at 436, 765 A.2d 624).

At the initial permanency plan hearing, the court is required to:

(i) Determine the child's permanency plan, which, to the extent *consistent with the best interests of the child,* may be, in descending order of priority:

1. Reunification with the parent or guardian;

2. Placement with a relative for:

A. Adoption; or

B. Custody and guardianship under § 3–819.2 of this subtitle;

3. Adoption by a nonrelative;

4. Custody and guardianship by a nonrelative under § 3–819.2 of this subtitle; or

5. Another planned permanent living arrangement. . . .

C.J.P. § 3–823(e) (emphasis added).

In developing a permanency plan, the "best interests of the child" are the primary consideration. Md.Code (2006 Repl. Vol., 2008 Supp.), § 5–525(e)(1) of the Family Law Article ("F.L."). The following factors should be considered in determining what is in the best interests of the child:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

F.L. § 5–525(e)(1); C.J.P. § 3–823(e)(2).

■ The court is required to review the child's permanency plan "at least every 6 months until commitment is rescinded. . . ." C.J.P. § 3–823(h)(1)(iii). At the review hearing, the court shall:

(i) Determine the continuing necessity for and appropriateness of the commitment;

(ii) Determine and document in its order whether reasonable efforts have been made to finalize the permanency plan that is in effect;

(iii) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment. . . .

C.J.P. § 3–823(h)(2). At the permanency review hearing, the court reviews "the permanency plan for the child as originally

established in the disposition hearing and assess[es] the status of the plan and whether it still serves the best interest of the child or needs to be changed to accomplish that goal." *In re Ashley E.*, 158 Md.App. 144, 161, 854 A.2d 893 (2004), *aff'd*, 387 Md. 260, 287, 874 A.2d 998 (2005).

In this case, there is no dispute that, without assistance, Ms. B. is unable to provide a safe and healthy home for her four children, each of whom have special educational and emotional needs. The trauma inflicted on the children before they were removed from the home has been set forth, *supra*. One of the therapists who saw Ms. B. opined that her cognitive limitations made it unlikely that she "would be able to adequately cope with the ever-changing and increasing demands of parenting." The therapist stated that Ms. B.'s ability to properly care for her children was "highly questionable." Indeed, as the trial court noted, Ms. B. required "hands-on assistance of the Department to meet her very own personal needs," and Ms. B. was "not able to access or to negotiate the system that's necessary to provide for the safety of the four children, or to attend to their developmental and educational needs."

Maryland law requires, however, except for circumstances not relevant here, that the Department "make 'reasonable efforts' in support of a permanency plan of parental reunification." *In re James G.*, 178 Md.App. 543, 570, 943 A.2d 53 (2008) (quoting F.L. § 5–525(d)(1)). It also requires a court to make a finding whether the Department made "reasonable efforts" to "[f]inalize the permanency plan in effect for the child." C.J.P. § 3–816.1(b).

█ It is that requirement that is at issue in this appeal. As noted, Ms. B.'s contention that the court abused its discretion in changing the permanency plan from reunification to adoption is based on her claim that the court erred in finding that the Department made "reasonable efforts" toward reunification. A circuit court's finding regarding whether the Department made reasonable efforts toward reunification is a factual finding that the appellate court reviews pursuant to the clearly erroneous standard. *See In re James G.*, 178 Md.App.

at 588, 943 A.2d 53 (finding that reasonable efforts were made was clearly erroneous); *In re Ashley E.*, 158 Md.App. at 167, 854 A.2d 893 (finding that reasonable efforts were made was not clearly erroneous).

This Court recently discussed the "reasonable efforts" requirement in *In re James G.* In that case, Judge Hollander explained for this Court that the "reasonable efforts" requirement had its genesis in federal law, specifically the Adoption Assistance and Child Welfare Act of 1980 ("AACW"), which " 'sought to end the stagnation [of] keeping children in foster homes by requiring states to make reasonable efforts to reunite families.' " 178 Md.App. at 572–73, 943 A.2d 53 (quoting Kathleen S. Bean, *Reasonable Efforts: What State Courts Think,* 36 U. Tol. L.Rev. 321, 325 (2004–2005)).[16]

In 1997, however, Congress revised the AACW by enacting the Adoption and Safe Families Act ("ASFA"). *Id.* at 575, 943 A.2d 53. The new statute was enacted in response to criticisms that included

"charges that children were still in foster homes too long. The charge was that they lingered now, not because of agency inaction, but because agencies were engaged in excessive efforts to 'repair hopelessly dysfunctional families. Instead of the permanency intended by the federal reasonable efforts clause, impermanency result[ed].' Perhaps of even greater concern, however, was the perception that children were being reunited with parents when it was not safe to do so in the name of reasonable efforts."

*Id.* at 575–76, 943 A.2d 53 (quoting Bean, 36 U. Tol. L.Rev. at 326). Accordingly,

"Congress sought to clarify 'reasonable efforts' and respond to concerns that AACWA had encouraged states to go too far in preserving parent-child relationships that were more

---

**16.** In order for a State to qualify for federal reimbursement for State payments for foster care, there must be " 'a judicial determination to the effect that . . . reasonable efforts' to reunify the family or finalize the permanency plan 'have been made.' " *In re James G.,* 178 Md.App. 543, 577, 943 A.2d 53 (2008) (quoting 42 U.S.C. § 672(a)(2)(A)(ii)).

harmful than beneficial. It did so in ASFA, primarily by making the child's health and safety 'paramount.' In line with this change, permanency for children moved to the forefront. Under ASFA, children were no longer doomed to spend their years waiting for reunification efforts to make their homes safe. Some situations were exempted from the reasonable efforts requirement, the time period for making reunification efforts was shortened, and adoption was encouraged. If efforts to reunite parent and child were not effective within a limited time, parental rights were to be terminated and adoption sought."

*Id.* at 576, 943 A.2d 53 (quoting Bean, 36 U. TOL. L.REV. at 326). Thus, the ASFA made clear that " 'in determining reasonable efforts to be made with respect to a child . . . the child's health and safety shall be the paramount concern.' " *Id.* (quoting 42 U.S.C. § 671(a)(15)(A)).

Federal law does not define the term "reasonable efforts." Rather, it " 'is a directive whose meaning will obviously vary with the circumstances of each individual case.' " *Id.* at 581, 943 A.2d 53 (quoting *Suter v. Artist M.*, 503 U.S. 347, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992)). Maryland's General Assembly has defined "reasonable efforts" in C.J.P. § 3–801(v) as follows: " 'Reasonable efforts' means efforts that are reasonably likely to achieve the objectives set forth in § 3–816.1(b)(1) and (2) of this subtitle." [17] This definition is amorphous. Thus, it is clear that there is no bright line rule

---

**17.** C.J.P. 3–816.1(b) provides, in part, as follows

  (b) *Findings required.*—

  (1) In a hearing conducted in accordance with § 3–815, § 3–817, § 3–819, or § 3–823 of this subtitle, the court shall make a finding whether the local department made reasonable efforts to prevent placement of the child into the local department's custody.

  (2) In a review hearing conducted in accordance with § 3–823 of this subtitle or § 5–326 of the Family Law Article, the court shall make a finding whether a local department made reasonable efforts to:

    (i) Finalize the permanency plan in effect for the child; and

    (ii) Meet the needs of the child, including the child's health, education, safety, and preparation for independence.

to apply to the "reasonable efforts" determination; each case must be decided based on its unique circumstances.

Cases from this Court and the Court of Appeals have given some guidance on what constitutes reasonable efforts to support a parent's efforts to reunify with his or her child. The Court of Appeals explained:

> [T]he State [may not] leave parents in need adrift and then take away their children. The court is required to consider the timeliness, nature, and extent of the services offered by DSS or other support agencies, the social service agreements between DSS and the parents, the extent to which both parties have fulfilled their obligations under those agreements, and whether additional services would be likely to bring about a sufficient and lasting parental adjustment that would allow the child to be returned to the parent. Implicit in that requirement is that a reasonable level of those services, designed to address both the root causes and the effect of the problem, must be offered—educational services, vocational training, assistance in finding suitable housing and employment, teaching basic parental and daily living skills, therapy to deal with illnesses, disorders, addictions, and other disabilities suffered by the parent or the child, counseling designed to restore or strengthen bonding between parent and child, as relevant. Indeed, the requirement is more than implicit. FL § 5–525(d), dealing with foster care and out-of-home placement, explicitly requires DSS to make "reasonable efforts" to "preserve and reunify families" and "to make it possible for a child to safely return to the child's home."

*In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 500, 937 A.2d 177 (2007). *Accord In re James G.*, 178 Md. App. at 586, 943 A.2d 53.

It is clear, however, that there are limits on what the Department must do to satisfy the "reasonable efforts" requirement:

> The State is not obliged to find employment for the parent, to find and pay for permanent and suitable housing for the

family, to bring the parent out of poverty, or to cure or ameliorate any disability that prevents the parent from being able to care for the child. It must provide reasonable assistance in helping the parent to achieve those goals, but its duty to protect the health and safety of the children is not lessened and cannot be cast aside if the parent, despite that assistance, remains unable or unwilling to provide appropriate care.

*Rashawn H.*, 402 Md. at 500–01, 937 A.2d 177. *Accord In re James G.*, 178 Md.App. at 586–87, 943 A.2d 53.

In *In re James G.*, this Court held that, where the basis for terminating the father's parental rights was the father's lack of employment and stable housing, "the juvenile court erred in finding that the Department made reasonable efforts toward reunification" by making "a single referral to a vocational resource." *Id.* at 601, 943 A.2d 53. This Court explained that, "[a]lthough the Department's efforts need not be perfect to be reasonable, and it certainly need not expend futile efforts on plainly recalcitrant parents, its services must adequately pertain to the impediments to reunification." *Id.*

Here, the Department did much more than make a single referral. The trial court found, and it is not disputed, that the Department made the following efforts to achieve the permanency plan of reunification:

a. referring Mother to the DDA and DORS;

b. assisting in Mother's preparation of the application for services and its submission and achieving placement of Mother on a waiting list (second tier);

c. attempting to determine when Mother might be able to receive services (however, the efforts did not meet with success in determining when the services might be available);

D. determining when Mother might be able to be placed with Melwood, only to find that, although an assessment was done, Melwood has lost the assessment and Melwood is no longer accepting clients of DORS;

e. contacting the Community Connections Agency to determine if other funds were available for the services that were not readily accessible through DDA and DORS and funds that might have been available after the December review in this case had been exhausted by January, 2009;

f. funding and obtaining a necessary neuropsychological evaluation of Mother in an effort to provide an evaluation that would have been provided by other sources;

\* \* \*

i. assisting Mother in reactivating her medical assistance;

j. arranging for and transporting Mother for medical appointments, including a gynecological examination, as well as an examination to address issues of high blood pressure;

k. transporting Mother to educational meetings and appointments affecting [Shirley] and assisting Mother in understanding what was occurring and assisting her in questioning;

l. transporting Mother to visits with [Shirley] and her siblings[.]

Ms. B. contends, however, that these actions did not constitute "reasonable efforts." She notes that the Department identified specialized services that potentially could have helped her achieve reunification with her children, but they were not offered to her due to funding problems. Ms. B. argues that, in light of the Department's failure to provide such services, the court erred in finding that the Department made reasonable efforts toward reunification.

In support of her argument, Ms. B. relies on *In re Adoption/Guardianship Nos. J9610436 & J9711031,* 368 Md. 666, 796 A.2d 778 (2002) (*"Case 36"*). In that case, the Court of Appeals reversed a circuit court's decision to terminate the parental rights of Mr. F., a father with "cognitive limitations." *Id.* at 682, 796 A.2d 778. The Court described Mr. F. as a high school graduate with steady employment, who experi-

enced difficulty with reading, but who had obtained a driver's license and maintained his own residence. *Id.* at 684, 687–88, 796 A.2d 778. The Court found that there was insufficient evidence that the Department had "made adequate reunification efforts to improve [Mr. F.'s] parenting skills." *Id.* at 698, 796 A.2d 778. It noted that, "[i]nsofar as we have been able to discern from the record, [the Department] never offered any specialized services designed to be particularly helpful to a parent with the intellectual and cognitive skill levels [the Department] alleges are possessed by petitioner," noting specifically that the Department did not seek to utilize services that might be available through DDA. *Id.* at 682–83, 796 A.2d 778.

The Court explained why the Department's efforts were insufficient:

> Primarily, [the Department] failed petitioner, and did not adequately perform its statutorily mandated duties under section 5–313(c)(2), by failing to provide a timely and sufficiently extensive array of available programs for petitioner, who, while perhaps hampered by some cognitive limitations, is eager and may well be able, with properly tailored services, to care for his children. From the moment petitioner came to ask for help, [the Department], as far as we can discern, provided only untailored reunification services. [The Department] should have, instead of providing services for which there was little or no need, provided more specific services for petitioner who consistently displayed a willingness and genuine desire to care for his children. [The Department] had at its disposition better suited services for petitioner.

*Id.* at 700–01, 796 A.2d 778. Ms. B. cites to the Court's statement that, "[u]ntil such services are offered, and petitioner avails or does not avail himself of such services, it is not clear that reunification is unforeseeable." *Id.* at 694, 796 A.2d 778.

We find *Case 36* to be distinguishable from this case. In that case, the Department did not seek the services of any

agencies that assist parents with developmental disabilities. As indicated, the Court specifically noted that the Department did not seek "to utilize services that might be available through the Developmental Disabilities Administration." *Id.* at 683, 796 A.2d 778. Here, the Department did seek services from DDA, as well as from other sources, such as DORS, Melwood, and ARC. The services, however, were not available.

Additionally, unlike in *Case 36*, the evidence here indicated that, even with assistance, it was questionable whether Ms. B. would be able to care for her children. The evidence showed that Ms. B. could not even take care of her own needs, requiring the Department's help to make appointments and transport her to the appointments.[18]

The Department, nevertheless, made extensive efforts to get Ms. B. services that might enable her to reunify with her children. It referred Ms. B. to parenting classes with the Family Tree. It arranged, and paid for, individual mental health therapy at Community Counseling and Mentoring, with therapist Debbie Austin, to address Ms. B.'s mental health needs and parenting skills. The Department then sought more specific services for Ms. B. due to her cognitive limitations, including referring Ms. B. to DORS, Melwood, and DDA, and helping Ms. B. complete an application for services. When Ms. B. was placed on a waiting list for DDA because adequate funding was not available, the Department attempted, albeit without success, to locate an alternative source of funds through the Community Connections Agency. It provided Ms. B. with information about ARC, which offered a support group for parents with developmental disabilities. Additionally, the Department paid for an individual neuropsychological evaluation for Ms. B. It cannot be said here, in

---

18. As indicated, the therapist who saw her in 2008 questioned whether Ms. B. was capable of caring for her children due to her cognitive limitations. And, at the June 2009 hearing, Ms. Gimperling testified that, if given another year, she did not know what the Department could do to make it safe for the children to return home.

contrast to *Case 36*, that the Department did not seek specialized services to assist Ms. B.[19]

That the Department's efforts to connect Ms. B. with services for parenting and basic living skills were unsuccessful, because the services were not available, does not mean that the Department's actions did not satisfy the "reasonable efforts" requirement. *See In re James G.*, 178 Md.App. at 601, 943 A.2d 53 ("the Department's efforts need not be perfect to be reasonable . . ."). Indeed, the Code of Maryland Regulations ("COMAR") provides that the Department shall provide, "[t]o the extent that funds and other resources are available, a range of services that will facilitate or maintain successful reunification of the child. . . ." COMAR 07.02.11.14(A) (emphasis added). The Department certainly must make good faith efforts to provide services to achieve reunification, taking into consideration the cognitive limitations of a parent. It cannot provide services, however, if they are not available.

Although we did not find any Maryland cases addressing the availability of services as it relates to the "reasonable efforts" requirement, we find instructive cases from other jurisdictions. *In re William, Susan, & Joseph*, 448 A.2d 1250 (R.I.1982), involved the termination of parental rights of a

---

**19.** There are other factors distinguishing this case from *In re Adoption/Guardianship Nos. J9610436 & J9711031*, 368 Md. 666, 796 A.2d 778 (2002) (*"Case 36"*). In *Case 36*, the issue involved the termination of parental rights of a father who had "no history of child abuse or willful neglect," *id.* at 688, 796 A.2d 778, and who was employed and showed the potential to be able to parent his children. *Id.* at 683–84, 796 A.2d 778. It was under these circumstances that the Court of Appeals found that it was "too soon to sever all relationships with this non-abusive, non-neglectful parent, for all time, with his children." *Id.* at 703 n. 24, 796 A.2d 778. Here, by contrast, the court did not terminate Ms. B.'s parental rights; it merely changed the permanency plan. The court did not "sever all relationships," but rather, it ordered that Ms. B. have "liberal unsupervised visitation" with her children, and it ordered the Department to continue to monitor the status of Ms. B.'s application for services with DDA and DORS. Moreover, in contrast to the children in *Case 36*, the children here suffered from clear abuse and neglect while in Ms. B.'s care. There was both physical and sexual abuse of the children, and Dr. Lewis' report indicated that, in April 2009, the children were still suffering from post-traumatic stress disorder. *Case 36* is a very different situation from that presented here.

mother who suffered from "moderate retardation." *Id.* at 1251, 1253. The Supreme Court of Rhode Island held that the Department of Children and Their Families ("DCF") made "reasonable efforts" to foster the mother's parental relationship with her three children, even though it was not able to provide the mother with every service recommended by a psychologist hired by DCF. *Id.* at 1255–57. The court noted that the term " 'reasonable' " is "a word 'elastic in its nature ... [requiring] consideration of the conditions and circumstances in determining what is reasonable in a particular situation.' " *Id.* at 1255 (citation omitted). The court found that, although DCF was unable to implement all of the psychologist's recommendations, it worked "conscientiously, and faithfully to encourage and strengthen [the mother's] parental relationship." *Id.* at 1256. The court explained that, "just as [the mother's] particular needs are factored into the 'reasonable efforts' equation, so too must be the reality that many of the services DCF might ideally have provided were unacceptable to Gloria or unavailable through the department." *Id.* Thus, the failure to render all services recommended did not prevent a finding that the Department's efforts were reasonable. *Id.* at 1256–57.

Similarly, in *People in Interest of M.K.*, 466 N.W.2d 177, 178, 185 (S.D.1991), social services removed a child from the custody of a mother, age 21, who was "borderline mentally retarded," because of concerns of her ability to care for the child. *Id.* at 178. After social services worked with the mother for two years without significant improvement, it recommended terminating the mother's parental rights. *Id.* at 185. The mother argued that, before terminating her parental rights, she "should have been afforded counseling through additional state programs; specifically, the Intensive Preventive Placement program (IPP) and Adult Foster Care." *Id.* In rejecting the mother's argument, the Supreme Court of South Dakota explained that "there was no IPP counselor in her area," and "[t]ermination of parental rights is not conditioned upon exhaustion of every possible form of assistance." *Id.*

Here, as indicated, the Department made good faith efforts to provide services to achieve reunification; it made numerous attempts to obtain services for Ms. B. Although the Department was unable to obtain services from DDA or Melwood, it was not from lack of effort by the Department. We agree with the Supreme Court of Rhode Island that the unavailability of potential services is a factor to be considered in determining whether "reasonable efforts" have been made to provide services. What constitutes "reasonable efforts" must be determined in light of the resources available to the Department. Under the circumstances here, the court's finding that the Department made reasonable efforts to achieve the permanency plan of reunification was not clearly erroneous.

■■■ We turn next to the circuit court's subsequent finding that it was in the best interests of the children for the permanency plan to change to adoption. The trial court "is in the unique position to marshal the applicable facts, assess the situation and determine the correct means of fulfilling a child's best interests." *Case 36*, 368 Md. at 696, 796 A.2d 778 (quoting *In re Mark M.*, 365 Md. 687, 707, 782 A.2d 332 (2001)).

We are sympathetic to the plight of Ms. B., who by all accounts has done much, although not all, that the Department has asked to achieve reunification with her children. The appropriate inquiry, however, is the best interests of the children. Given the abusive conditions to which the children were subjected while in Ms. B.'s care, the 28 months that the Department had been working to find services to assist Ms. B. to care safely for her four children, who all have special needs, the unavailability of services that potentially could help, and the uncertainty whether such services even exist, we find no abuse of discretion by the circuit court in changing the permanency plan for each of the children from reunification to adoption.[20]

---

20. We note again that the court ordered the Department to continue to monitor the status of Ms. B.'s application for services with DDA and

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

------

DORS, and it ordered that Ms. B. have liberal unsupervised visitation with her children.